Good morning again. Our next case is Zomm v. Apple, 2020-2000. Mr. Zinner, representing Zomm, please proceed. Thank you, Your Honor. Good morning. May it please the Court. The PTAB erred in two critical ways below. First, it incorrectly found that the vehicle network in Berry 351 is a wireless security device, as that term is used in the 895 patent. And second, it found that playing a pre-recorded message to a telephone, as shown in Berry 351, covers sending a pre-recorded message, as claimed in the 895 patent. Turning first to wireless security device, the Board's interpretation of that term is not in line with how the invention is described throughout the 895 patent. It's way too broad. All the figures in the 895 patent that show the device, which can be found at Appendix 229, 232, 233, and 235, show it as a single piece of equipment and certainly portable. The specification also says that a user of the wireless device will be able to attach it to a So, looking at the wireless device through this lens, Berry 395 cannot be a wireless security device. Berry is, and calls itself, a vehicle network. That's at Appendix 1637, at column four lines 22 and 25, for example. You know, my learned colleagues representing Apelli in their papers called Berry a vehicle security system, and Berry is both of these things. But to say that a vehicle network of distributed components is a wireless security device, as that term is used in the 895 patent, would be incompatible with the purpose of the invention in the 895 patent. With the network in Berry 395, you can't walk away from it. It certainly will never look like the device shown in every figure in the 895 patent that shows the device. You could never put it on a keychain, and it would never be portable. Excuse me, this is Judge Stoll. Do the claims require such things as that it be portable or be on a keychain, or that it, you know, have a shape like that in the figure? They don't, right? They do not, Your Honor. So, you're just really relying on the fact that a device should be more compartmentalized? That's correct, and that I believe the specification discusses wireless security device in that way. But it's not a lexicography issue, right? You don't have a lexicography argument, do you? Or a disclaimer argument? No, I believe our argument is that to construe wireless security device as broadly as the Board did, it would be beyond the broadest reasonable interpretation in light of how that term is discussed in the specification. Okay. So, I'm sorry, was there a question? No, you may proceed. Oh, thank you, Your Honor. So, you know, I did just want to underscore that it would be, you know, disingenuous of me not to say that the vehicle network in Barry 351 is the broadest possible interpretation of a wireless security device. We mentioned this in our briefing. If we were considering what a wireless security device is in the abstract, but that's not the right inquiry. If we consider the broadest reasonable interpretation in light of the specification of the 895 patent, as the Board should have, it cannot include a distributed network that looks like Barry 351. What about when I look at, you know, the language in the preamble, it says a wireless security device comprising, and then it lists all the hardware that has to be in there, the processor, wireless transceiver, the memory computer program, and I see, you know, analogous language in the specification itself. For example, in the brief summary of the disclosure, why isn't that definitional of what a wireless security device is? Is it something that has all of these component parts? I think looking at it that way, Your Honor, you are still outside of the broadest reasonable interpretation in light of the purpose of the invention. And that takes me a little bit more to perhaps if we were looking at, for example, a broadest possible interpretation of a wireless security device without regard to what the invention of the 895 patent was meant to do, those things would be a little bit more controlling. Your main argument is that the construction is inconsistent with the specification. That's correct. Okay. Because, you know, it's not just about... Yes, I think that's right, Your Honor. I think that's the best way I can put it. So, moving on, I wanted to just... One little offshoot of this argument relates to Claim 7 specifically, where the board found that light, which discloses a vibration motor in a vehicle seat or steering wheel, could be used to show an expectation of success in adding a vibration motor to the wireless security device that is allegedly shown in Berry 351. But, you know, we respectfully submit that this makes no sense because even Apelli was very clear about what it believed the wireless security device in Berry 351 to be, and this can be shown in Appendix 368 through 369, which shows Figures 1, 2, and 6 of Berry 351. And there's no vehicle seat or steering wheel in these drawings, and that's the only place that light talks about adding a vibration motor. So we don't see how light can be used to show reasonable expectation of success in adding a vibration motor to that alleged wireless security device. I'd like now to switch gears and talk a little bit about the difference between Play and Send. The 895 patent clearly distinguishes between Play and Send, and under that distinction, Berry clearly only plays a prerecorded emergency message. So Play is communicating a message in audible form, such as voice, and you can see this in Appendix 241 to 242, Column 12, Line 67 through Column 13, Line 5. So my learned adversaries agree that this is what the 895 patent says Playing is. That's at Apelli's brief, Page 4. So a way to think of this is that with Playing, nothing is left with the recipient. Like if someone plays your piece of music, you don't leave the performance with that piece of music. When something is sent, in contrast, such as a text message, the person on the other end of the telephone call, in this case, can view that data. And Apelli agrees that this is what the 895 patent says Sending is also. You can find that at Apelli's brief on Page 5. A way to look at this would be when you send something to someone, the recipient is left with what they have been sent. It's with them. So with these two things in mind, Berry only discloses that the vehicle network is playing an emergency message. After the data is voice synthesized, it's audibly played by the vehicle network, and the recipient is not left with anything. There's nothing that is sent to the recipient's phone. Can I direct your attention to a particular portion of Berry? I thought I answered this question fairly well. It's at column 5, lines 9 through 20. In this part of Berry, it says, the visual information received from the data processor 16 is converted into audible speech signals and then is either communicated through Speaker 32 or processed at Transceiver 38 for communication to Cellular Telephone 50 Transceiver across PicoNet 46. This language about how it's either communicated through the speaker, which I think you would say is played, or processed at Transceiver 38 for communication to Cellular Telephone 50 across PicoNet 46. That would be send, right? Why wouldn't that be send? That would not be send, Your Honor, because in that instance, you've still got voice-synthesized, audible sort of speech. So that's not being left with the recipient. So it's a little bit like sort of a different analogy, but if I hand you something versus if I mail you something, whatever the item is, it's getting to you, but it's not the same way at all. And so here, even... May I just finish my answer, Your Honor? You certainly may continue. It is your time. Thank you. So even in the latter section of that passage that you read, nothing is being left with the recipient, so I view that as play. And you are correct that the former part of that sentence, I would absolutely see as play. Can I ask one final question, which is simply this? This is a question I should review for substantial evidence, right? Whether that reference to process at Trim Fever 38 for communication to cellular telephone 50 across PicoNet 46, whether that's play or send, factual question reviewed for substantial evidence, right? Yes, Your Honor. Thank you. Thank you. And that completes my argument. Thank you. Thank you, Mr. Zender. We'll save your rebuttal time. Mr. Mannes? Thank you, Your Honor. May it please the Court. The Board's final written decision should be affirmed, starting with the sending limitation that we just left off on. Both Barry and Mr. Lanning's testimony provide substantial evidence that Barry discloses sending a prerecorded emergency message over Bluetooth to the phone. Barry discloses Bluetooth sending in multiple places, but Judge Stoll honed in on the clearest disclosure, which is column 5. And from lines 12 to 15, it expressly states that the analog sound signals from the voice synthesizer may be processed at the Bluetooth transceiver 38 for communication to cellular telephone 50 across PicoNet 46. And there's no dispute that the transceiver and PicoNet are both Bluetooth. That's disclosed in column 5 and also in column 8. So this disclose is sending a message over Bluetooth, which is illustrated in figure 1, and that's something the Board cited on Appendix 32, and it was annotated in our petition and appears in our brief at page 14. PicoNet 46 is the squiggly line at the bottom that connects transceiver 38 and the cellular telephone 50. So that is substantial evidence of sending, and there's also substantial evidence elsewhere in column 9 and Mr. Lanning's testimony about how Barry uses the term communicates, how the system communicates with the phone and how that means Bluetooth sending. I'll pause there. Can you address the suggestion that the difference between playing and sending has to do with the ephemeral or transitory character of what the recipient gets? So this clearly is disclosing sending. I'm not sure I quite understood that suggestion, but the ZOM is conceded in its brief that the message can comprise audio data, and audio data can be sent over a Bluetooth connection, and that's precisely what's being disclosed here. You have analog sound signals that represent audio, and then they're processed at this transceiver, so they're turned to data and communicated over the Bluetooth PicoNet, and so I'm not quite sure what distinction ZOM is drawing between that and what it's conceded in its briefing. For example, when you play a music file, which is a digital file, it can be sent over Bluetooth as data, and it's played audibly as analog, and you can have this conversion back and forth between analog and digital, and that's a way to affect sending across Bluetooth. So I'll pause there in case there are further questions on sending. Turning to the term... Please proceed, Mr. Mannes. Turning to the term wireless security device, the board properly determined that the board's broadest reasonable interpretation is not limited to a single piece of equipment. Counsel for the other side conceded just now that the claims don't limit the term, and that in the abstract the term device is not limited in this way. So the argument is entirely based on the written description, but the written description never states that a device of any sort must be a single piece of equipment. In fact, it discloses embodiments that are systems and that involve multiple pieces of equipment that wouldn't be in a single housing, like a computer with an external drive. And counsel for ZOM also conceded that there's no argument on lexicography or disclaimer or any other sort of clear signal argument. So on this broad written description, the term device is not limited to a single piece of equipment. And finally, on the vibration motor limitation, the board was entitled to find a reasonable expectation of success of incorporating i.e. vibration and to very late show that vibrating notification elements have been incorporated into vehicle systems before. And Mr. Lanning also testified that the use of vibration was well known. ZOM has presented no evidence of unpredictability or lack of reasonable expectation of success. Its argument appears to be that a steering wheel or seat is not included in FAERI, but that's just one way the vibrating element could be accomplished. It could also be that the board found a replacement of the notification feature of FAERI, which is already part of the system. And it seems that this argument is mostly based on the idea that a device has to be a single piece of equipment, which is not a correct interpretation of the term. So either way of doing it would be fine under the term device. Unless there are further questions, we would ask that the board's final written decisions be affirmed. Do I hear further questions? If not, we'll hear a rebuttal from Mr. Zinner. Thank you, Your Honor. I would just like to address one point, which is this concept that was raised in an earlier question and also echoed by Apple, which is that this idea that FAERI's disclosure of a Bluetooth communication must mean sending. And if we look at this from the perspective of the 895 patent, it discusses that playing can happen over Bluetooth as well. So the use of Bluetooth really does not inform this argument really in a meaningful way as a distinction. And that can be found in Appendix 241 to 242, columns 12, line 67, through column 13, line 5. And if that is true, as we submit that it is, then I would amend my answer earlier that it's a question of fact, because I believe it would then be a question of law because it goes to the meaning of the term. So that is more plain construction. That's all I have if there are no other questions. Thank you. Thank you, Mr. Zinner. We appreciate the arguments from both parties and the cases submitted.